ELLIS *v.* BLOCK.

4-8287                                    205 S. W. 2d 708

Opinion delivered November 10, 1947.
Rehearing denied December 8, 1947.

*Rose, Dobyns, Meek & House,* for appellant.

*Talley & Owen* and *Robert L. Rogers,* for appellee.

GRIFFIN SMITH, Chief Justice. The appeal requires construction of a contract, the Chancellor having held when the case was transferred from Circuit Court on the defendants' prayer for reformation that the plaintiffs, a partnership doing business as Block Realty Company, were entitled to a commission of $650 from the Ellises, husband and wife, who sold their home on North Jackson Street in Little Rock to Dr. and Mrs. Doyle W. Fulmer.

Essentials of the contract are copied in the margin[1]

---

[1] "We have this day placed with Block Realty Company for sale, the property described [on the reverse side of this card]. The said . . . Company shall have the sole and exclusive agency of the property from fifteen days [from September 23, 1946] and thereafter until notified by us in writing of its withdrawal from sale, and we authorize [a sale to be made] . . . according to the price and terms of payment herein specified, or any price and terms we may hereafter authorize them to accept, . . . price of property to be $15,000 net; $15,750 gross. If said property be sold or disposed of during the period above stated, no matter by whom or in what manner, or after the above period, on information obtained through this agency, we agree to pay to the Block Realty Company a commission of five per cent. . . . We also agree to offer this property only at the price of $15,750 and on the terms in this contract. . . ."

Material facts are not disputed. Dr. and Mrs. Ellis were advertising the property for sale. The realty Company sent James L. Banks, Jr., to discuss a listing. When Mrs. Ellis explained that her husband would not be in Little Rock until the following Sunday, Banks made an appointment for that date, in consequence of which the contract was procured. Banks, as a witness, readily admitted he told appellants he thought the Company would find a purchaser who would pay the price asked. During the fifteen-day period Banks took several "prospects" to see the property, but none was interested.

C. I. Wallace, another Company agent, called Mrs. Ellis and made an appointment to show the place to Mrs. Fulmer the following day. As an exhibit to testimony given by Wallace he filed Mrs. Fulmer's letter to the Company, dated October 9th, authorizing purchase for $13,000 cash. Wallace insisted that Mrs. Ellis did not object when he took Mrs. Fulmer to see the home. On the contrary, "she was very nice in cooperating".

After receiving Mrs. Fulmer's written proposal to purchase, Wallace telephoned Mrs. Ellis, who replied that Dr. Ellis was out of the city, but she promised to discuss the matter with her husband when he returned. Mrs. Ellis telephoned later and said she was not interested in Mrs. Fulmer's offer. When asked whether he tried to get Mrs. Ellis to make a contract, Wallace replied, "That is correct". He then stated in substance that the agency had not procured a customer who was ready, willing, and able to pay $15,000 for the home. The witness was asked whether, when he took Mrs. Fulmer to see Mrs. Ellis, he knew the contract had expired. His reply was: "It expired that night, I believe. If I recall correctly, it expired the night that I called her; that was the last day of the contract". And again: "You didn't ask for a new contract? Your written contract had expired, but you asked for permission to bring the customer out?" Answer, "That is correct".

Appellee's complaint contained the allegation that "The time set forth in said listing contract expired before a suitable purchaser was found, but the day follow-

ing the expiration of said listing contract, plaintiff's agent, Cliff Wallace, found a prospective purchaser''.

Dr. Doyle W. Fulmer testified that he authorized Mrs. Fulmer to make the $13,000 offer submitted by Wallace, but he did not see the place until approximately two weeks after it had been shown to Mrs. Fulmer. He did not make an inspection during the original negotiations with Wallace. About October 22, after Mrs. Fulmer's offer had been rejected when made through the Block agency, Dr. Ellis called Dr. Fulmer and asked whether he was still interested in the property. The reply was in the affirmative, ''provided the price is as originally offered''. Dr. Fulmer had at no time considered paying more than $13,000.

Mrs. Fulmer testified that when she went with Wallace to see the place October 9th she made the offer of $13,000, adding that ''not one penny more'' would be paid. A check for $100 was given Block by Mrs. Fulmer to bind the offer. This money was later returned. When a request was made for the refund Wallace first stated he did not believe the property could be bought for $13,000. Later he reported the offer had been definitely rejected. As an approach to the final transaction, Mrs. Ellis called Mrs. Fulmer and explained that while she thought the property to be worth $15,000, ''she would take a little less''. It was not until five or six telephone conversations had been engaged in directly between the Ellises and the Fulmers that the deal was closed. In the meantime Block had seemingly discontinued efforts to get the parties together on a price. Mrs. Fulmer told Wallace she was seriously considering buying directly from the owners, and he replied, 'Go right on through: you have a good buy there''.

Mrs. Ellis testified that after she had advertised the place at $15,000, Raymond Block and James Banks, Jr., came to see her. Both were ''enthusiastic'' in their belief that the amount asked could be procured. On the day following termination of the fifteen-day period Raymond Block called by telephone. Mrs. Ellis ''was on the point of reminding him'' that the contract was at an end,

but before the intended call could be made Block telephoned. One of his first statements was, "I suppose you realize this is the last day of our contract. We would like to renew it: wouldn't you?" Mrs. Ellis replied, "No, we are not interested in carrying it any further. Since the contract has expired, won't you please come out and remove your [advertising] signs? because I suppose that is your part of it". Mrs. Ellis then testified:

"He talked and talked of all that they could do, and then I said, 'Well, you haven't done it. It does not look like you are going to get our price, so we will just go on our own from here out, because this is the end of it. We are not interested in extending the contract'".

Other expressions of a similar nature were used. The net result of all testimony is that Mrs. Ellis explicitly told Block there would not be an extension of the contract. Dr. Ellis, when forming the purpose to sell, had concluded to move to Fayetteville, where he was connected with the University; and, as Mrs. Ellis expressed it, "our time was running out".

We agree with the Chancellor that facts did not warrant reformation of the contract. There was no mutual mistake, nor were the explanations and representations made by Banks to Ellis such as to support the allegation of fraud in procuring the signatures. Irrespective of what was said before the agreement was executed, Dr. Ellis had the opportunity to read the writing which embraced final understandings, and if he did not do this it was an act of individual carelessness as to which it was too late to recede. Denial of reformation, however, does not exclude relief.

When Mrs. Fulmer was taken by Wallace to inspect the property, the contract was treated as having terminated through expiration of the fifteen-day period. The original listing was given in order that the Ellises might realize $15,000 net. They were only willing to pay a commission above this sum. Block must have understood this, because he endeavored to procure a renewal or extension. The contractual language fixing fifteen days ". . . or thereafter until notified by us in writing" is of

no benefit to appellees because the requirement that notice should be in writing is waived.[2] The "period above stated"—during which a commission would be payable if the property were sold "no matter by whom or in what manner"—is not a sufficient predicate for the demand. The term had expired before Dr. and Mrs. Ellis sold for $13,000. The expression, "according to the price and terms of payment herein specified" clearly has reference to $15,750, or $15,000 net. The provision, ". . . or any price and terms we may hereafter authorize *them* in writing or verbally to accept" is of no value to appellees because there was no such authorization.

The decree is reversed and the cause dismissed.

---

[2] In Restatement of the Law of Contracts, § 407, p. 768, the rule is said to be that whenever two persons contract, no limitation self-imposed can destroy their power to contract again.